**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**(WESTERN DIVISION)**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MELISSA CATAPANO, an infant by her
father and natural guardian, John Catapano,
and JOHN CATAPANO, Individually and
DANIELLE CATAPANO, an infant by her
mother and natural guardian, CHRISTINE
CATAPANO and CHRISTINE CATAPANO,
individually,

        Plaintiffs,

    vs.

JIMINY PEAK MOUNTAIN RESORT, LLC
and WIEGAND SPORTS, LLC,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

C.A. NO.: 3:13-cv-30119-MAP

{Consolidated with Lead Case:
C.A. No. 3:13-CV-30108-KPN}

## DEFENDANT WIEGAND SPORT, LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AS TO ITS CROSS-CLAIMS AGAINST DEFENDANT JIMINY PEAK MOUNTAIN RESORT, LLC

Defendant, WIEGAND SPORTS, LLC (hereinafter "Wiegand"), by and through

undersigned counsel, hereby moves for summary judgment as to its cross-claims against

defendant JIMINY PEAK MOUNTAIN RESORT, LLC (hereinafter "Jiminy Peak")

pursuant to Rule 56 of the Federal Rules of Civil Procedures. In support of this motion,

Wiegand states the following:

## INTRODUCTION

The underlying action arose from an incident that occurred on August 12, 2012,

resulting in injuries to plaintiffs Melissa and Danielle Catapano. Plaintiffs allegedly

sustained injuries while riding the Alpine Coaster attraction (hereinafter "the ride")

owned and operated by defendant Jiminy Peak. Jiminy Peak purchased the ride from Wiegand. Jiminy Peak asserted cross-claims against Wiegand, seeking contribution and indemnity (both in contract and in common law), and alleged a claim for breach of contract. Wiegand also initiated cross-claims against Jiminy Peak, seeking contractual and common law indemnity and contribution.

As further outlined in detail herein, Jiminy Peak is not entitled to any common law or contractual indemnification or contribution from Wiegand. In fact, it is Jiminy Peak that owes Wiegand indemnification due to its defective operation of the ride and its violations of the applicable Massachusetts laws governing amusement ride safety, which caused or contributed to the injuries to the plaintiffs. The Consulting, Purchase, Delivery, Assembly, and Inspection Contract (hereinafter, the "Contract") between Jiminy Peak and Wiegand clearly intended for Jiminy to be responsible for safe operation of the ride and to take all necessary steps to ensure rider safety, and for Jiminy Peak to indemnify Wiegand for losses arising from Jiminy Peak's failure to do so.

The pleadings, depositions, and written discovery all indicate that there is no genuine issue of material fact that Wiegand is entitled to summary judgment on its cross-claims. Neither Jiminy Peak nor plaintiffs introduced an expert witness to substantiate any product defect allegations against Wiegand. Furthermore, factual evidence and expert discovery supports Wiegand's position that it is entitled to indemnification based on Jiminy Peak's defective operation of the Alpine Coaster and non-compliance with applicable laws. Evidence developed up until the close of discovery is insufficient to support Jiminy Peak's cross-claims, and Wiegand is entitled to judgment as a matter of law on its cross-claims.

## STATEMENT OF FACTS

Wiegand refers this Honorable Court to its Statement of Undisputed Facts pursuant to Local Rule 56.1 filed together herewith.

## LEGAL STANDARD

To secure summary judgment, the movant bears the burden of establishing that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 1609 (1970); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552 (1986). In addition, the moving party may meet its burden of showing an absence of a material issue by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. at 2553. If the moving party meets its burden, the nonmoving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Co.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986).

In pertinent part, Rule 56(e) of the Federal Rules of Civil Procedures reads:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.Pro 56(e)

This rule "requires the nonmoving party to go beyond the pleadings" and produce evidence of a genuine issue for trial. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553.

the nonmoving party may not rest upon the mere allegations or denials in its own pleadings. *Wynne v. Tufts University School of Medicine*, 976 F.2d 791, 794 (1st Cir.1992) (The core purpose of the summary judgment procedure is to pierce the boilerplate of the pleadings and evaluate the proof to determine whether a trial will serve any useful purpose). The district court must determine whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.242, 250, 106 S.Ct. 2505, 2511 (1986). Furthermore, in order for an issue to be genuinely in dispute, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2510. The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; a factual dispute that is neither genuine nor material will not survive a motion for summary judgment. *Anderson*, 477 U.S. at 248. Furthermore, the bare hope that additional discovery will provide the factual support that past discovery has failed to muster is insufficient to thrust aside a well-grounded motion for summary judgment. *Over the Road Drivers, Inc. v. Transport Insurance Co.*, 637 F.2d 816, 820 (1st Cir.1980).


**<u>ARGUMENTS</u>**

**I.     Plain Reading of the Contract Clearly reveals that the Parties Intended Jiminy Peak to Properly Ensure Rider Safety and Indemnify Wiegand for Losses From Lawsuits Stemming from Defective Operation and Non-Compliance of Applicable Safety Laws by Jiminy Peak**

Contractual agreements to indemnify are enforceable and are subject to the same rules of construction applicable to contracts generally. *Laiho v. CONRAIL*, 4 F. Supp. 2d 45 (D. Mass. 1998). "Massachusetts courts employ the general rules of contract interpretation to construe indemnification provisions. As with any contract, a written indemnification agreement is to be interpreted in light of its language, background and purpose." *Id.* at 50. This is particularly true when the contracting parties are commercial entities. *Kelly v. Dimeo, Inc.*, 581 N.E.2d 1316 (Mass. App. Ct. 1991).

> Where commercial entities have negotiated on a level playing field before entering their contractual arrangements, it is not necessary to explore the theoretical underpinnings of the indemnity doctrine . . . [a]greements voluntarily made . . . are not to be lightly set aside on the ground of public policy or because as events have turned it may be unfortunate for one party.

*Id.* at 13218.

Massachusetts law traditionally established that the contract of indemnity should be strictly construed. *See Boston & Me. R.R. v. T. Stuart & Son*, 236 Mass. 98, 104 (1920); *New York, N.H. & H.R.R. v. Walworth Co.*, 340 Mass. 1, 5 (1959). The strict construction rule originally was developed to ensure that the party assuming the liability understood the breadth of the undertaking. *See Boston & Me. R.R.*, 236 Mass. at 104 ("It is not to be assumed in the absence of clear stipulation that a contract is to be construed as creating a result so far reaching, and involving consequences which may be so hazardous and momentous"). However, Decisions from the past twenty years show a departure from the traditional rule which required that indemnity agreements be construed strictly against the indemnitee:

> The rule that indemnity contracts are to be strictly construed against the indemnitee no longer [applies] in Massachusetts. The modern rule is that contracts of indemnity are to be fairly and reasonably construed in order to ascertain the intention of the parties and to effectuate the purpose sought

> to be accomplished. Courts are expected to give effect to the parties'
> intentions at the time of the agreement and to give them reasonable
> meaning

*MacGlashing v. Dunlop Equip. Co.*, 89 F.3d 932, 940 (1st Cir. 1996) ; *See also N. Am. Site Developers, Inc. v. MRP Site Dev., Inc.*, 827 N.E.2d 251, 255 (Mass. App. Ct. 2005) (the "rule that indemnity agreements are to be strictly construed against the indemnitee [is] not followed in Massachusetts").

Now, contracts of indemnity are to be fairly and reasonably construed in order to ascertain the intention of the parties and to effectuate the purpose sought to be accomplished. *Post v. Belmont Country Club*, 805 N.E.2d 63,69 (Mass. App. Ct. 2004); *Shea v. Bay State Gas Co*., 418 N.E.2d 597 (Mass. 1981).

In this case, the intent of the parties is clear from the plain reading of the Contract. The parties do not intend for Wiegand to indemnify Jiminy Peak regardless of Jiminy Peak's own fault or role in causing the injuries which results in the lawsuit. Jiminy Peak relies completely, in a vacuum, on section 12 A. (1) of the Contract which provides that "in the event of a product liability suit against [Wiegand], [Wiegand] shall, at its own expense, defend any suit or proceeding brought against [Jiminy Peak] and shall fully protect and indemnify [Jiminy Peak] against any and all losses, liability, cost, recovery, or other expense in or resulting from such breach, default or suit", (*see* **Exhibit A** at p. 6). However, this is not the only circumstance under which indemnification is triggered. The parties also considered the circumstance in which, as was the case in the action *sub judice*, the underlying *cause* of the lawsuit stemmed from the actions and inactions of Jiminy Peak.

As an initial matter it must be noted that in the subject action, plaintiffs made no product liability claims against Jiminy Peak. Plaintiff's product liability claims (which

were in the end unsubstantiated by any expert reports) were made against Wiegand. Plaintiffs' claims against Jiminy Peak are grounded in Jiminy Peak's negligent and unsafe operation of the ride. Since Jiminy Peak's malfeasance was the cause of the subject incident, Jiminy Peak is obliged to defend and indemnity Wiegand, as mandated by the sensible and unambiguous terms of the contract, and which reflects the true intentions of the parties.

The Contract also provides for indemnification of Wiegand by Jiminy Peak, given circumstances where Jiminy Peak's own actions and inactions caused the loss sustained by the parties. Specifically, section 12A. (2) states:

> (2) [Jiminy Peak] agrees to protect, indemnify, defend and hold [Wiegand] harmless from and against any and all losses of [Wiegand] arising out of or sustained, in each case, directly or indirectly, from **any breach of representation, covenant of [Jiminy Peak] made herein or any default by [Jiminy Peak] hereunder,** including without limitation, **from defective/bad maintenance and/or operation of the Alpine Coaster caused by [Jiminy Peak]'s gross negligence or willful misconduct, (except to the extent such maintenance and/or operation was in conformity with [Wiegand]'s operation and maintenance specifications or recommendations), or non-compliance with applicable law**. [Jiminy Peak] shall not be liable for any consequential, special, incidental, exemplary, or punitive damages or any claim for lost business or lost business opportunities.

Exhibit A at p. 8 (emphasis added).

Section 12 A. (1) broadly considers that a lawsuit containing product liability allegations may arise against both Wiegand and Jiminy Peak. Section 12 A. (2) better defines the circumstances under which Wiegand must be indemnified by Jiminy Peak from losses incurred in association with such lawsuits. These expressly include breach of covenant by Jiminy Peak, defective operation of the ride and non-compliance of applicable laws. 12 A. (2) is not, by any definition, a simple parallel indemnity clause. It is important to note also that one of the covenants mentioned, the breach of which results

in the triggering of Jiminy Peak's indemnity obligations, includes <u>the obligation for Jiminy Peak to safely and properly operate the ride and to take all necessary measures to ensure rider safety</u>. Specifically, section 8(i) of the Contract provides:

> **Operation of Alpine Coaster. [Jiminy Peak] shall ensure that only trained personnel will operate the Alpine Coaster in accordance with the design specifications and written maintenance and instructions provided by [Wiegand]**, to the extent such instructions do not conflict applicable regulatory or insurance authorities' instructions. [Jiminy Peak] will make certain that each customer riding the Alpine Coaster signs a standard waiver form disclaiming liability for any injuries sustained **and shall take all necessary preventative measures in order to ensure rider safety**. [Jiminy Peak] shall provide a copy of the waiver to the [Wiegand] prior to the Handing Over Date.

**Exhibit A** at p. 6 (emphasis added).

Section 8(i) highlights the recognition of the parties that Jiminy Peak, as the operator of the ride, is in the best position to, and in fact has the obligation to, ensure the safety of the riders, and to properly operate the ride in the manner that is in conformity with applicable laws and Wiegand's safety instructions. It is further proof that section 12 A. (1) should not be considered in a vacuum, and that the parties intended that indemnity should be properly extended to Wiegand in the event that losses are sustained due to Jiminy Peak's culpable conduct or non-compliance with applicable law pertaining to rider safety.

Furthermore, it is clearly the intent of the parties that any liability for personal injury arising from the use of the ride must be defended by Jiminy Peak. Addendum B of the Contract states:

> Liability
> Any additional liability for damages beyond that provided for in the above-stated terms is excluded, irrespective of the nature of the legal claim. **This applies in particular to personal injuries that may occur during the use of Seller's sports and leisure installations. The Buyer**

**agrees to defend against such claims by obtaining adequate liability insurance.**

Exhibit A at p 13. (emphasis added).

The inclusion of this paragraph in Addendum B of the Contract, when read in conjunction with Jiminy Peak's obligations under section 8(i) to ensure ride safety, further demonstrates that the parties intended for Jiminy Peak to defend against personal injury liability arising from injuries sustained by patrons during the use of the ride, and to indemnity Wiegand, in the event that Jiminy Peak's actions lead to a lawsuit against both parties. It is clear from this paragraph that it is not the intent of the parties for Wiegand to defend and indemnify Jiminy under all circumstance where they are involved in a liability suit arising from the use of the ride.

There is no doubt that, in the event of a lawsuit, 12 A. (1) should not be considered in a vacuum, without considering the role of Jiminy Peak. Contractual indemnity language is only ambiguous where "an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and obligations undertaken." *Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076, 1083 (1st Cir. 1989). Here, considering the plain language of section 12 A as a whole, and in conjunction with Jiminy Peak's obligations under Section 8(i), and Jiminy Peak's sole fault in *causing* the accident, there is no ambiguity as to the parties' intention to require Jiminy Peak to indemnity Wiegand, in the event that Jiminy Peak's actions lead to a lawsuit against both parties.

As further detailed below and in the expert reports of Jacob Fisher and Eugenia Kennedy (*see* **Exhibits N** and **O**), there is uncontested evidence[1] that Jiminy Peak's own actions, and violations of the applicable laws, triggered the indemnity provisions as contemplated by section 12 A. (2).

## II. Wiegand is Entitled to Contractual Indemnification Due to Jiminy Peak's Violation of the Applicable Statutes Governing Amusement Ride Safety and Due to Jiminy Peak's Defective Operation of the Ride.

After extensive discovery and investigation, the written discovery and deposition testimonies making up the undisputed facts in this matter confirm that Jiminy Peak's own actions, defective operation of the subject ride, and violations of the applicable law caused or contributed to the plaintiffs' accident, and led to the losses sustained by both Wiegand and Jiminy. *See*, generally, expert of Eugenia Kennedy attached here as Exhibit__. Therefore, there is no question that Jiminy Peak is obliged to defend and indemnify Wiegand.

### A. Jiminy Peak's Non-Compliance with Applicable Law.

As outlined in Ms. Kennedy's unchallenged report, Jiminy Peak violated several Massachusetts law governing the operation of Amusement Rides. These include Massachusetts Amusement Regulations 520 CMR 5.04 6(e), 520 CMR 5.08 (5)(a)7. *See* **Exhibit O**, at pp. 8-9. Jiminy Peak also failed to ensure full compliance with 520 CMR 5.03. *See* **Exhibit O**, at pp.6-7. *See also*, Holmes report, **Exhibit M**, at p. 10.

     i.     520 CMR 5.04 6(e)

---

[1] Jiminy Peak never retained any exerts to refute the opinions of Kennedy and Fisher. In fact, their opinions were so sound that Jiminy Peak did not bother to challenge their opinions under cross examination in deposition.

The Massachusetts Amusement Regulations found in MA 520 CMR 5.04 define the responsibilities of an owner of an amusement ride, such as Jiminy Peak, in training ride operators. Section MA 520 CMR 5.04 (6)(e), states the following:

> (e) The owner shall instruct all operators to give their full attention to any ride they operate.

Contrary to this requirement, evidence in this case clearly establishes that Jiminy Peak employees, who were responsible for ensuring rider safety, failed to give their full attention to the ride as required by the law.

In particular, on the date of the accident, Jiminy Peak employee Alex Belanger was working in the critical position as the Top Station attendant. *See* **Exhibit K** at p. 45. The top station attendant is the last "line of defense" to insure safe rider operation. His job is to supervise the riders as they reach the top of the mountain, and before they descend down the track to insure that they are fully compliant with all rules for the operation of the slide. *See* **Exhibit K** at p. 55. The Top Station attendant also has access to a button control that could be used to stop the lift in the event of an unsafe condition and make sure no one could proceed down the course. *See* **Exhibit K** at p. 39. According to the testimony of all Jiminy Peak employees deposed, the top operator is supposed to monitor the rider's compliance with the safety rules, including the proper use of the seat belts. *See* **Exhibit F** at p. 26-27; **Exhibit K** at pp. 35-36, 130-131. They also testified that any rider caught disobeying the safety rules is supposed to be banned from riding. *See* **Exhibit F** at p. 38; **Exhibit K** at pp. 148; **Exhibit L** at pp. 20-21. Jiminy Peak employee Belanger failed to give their full attention to any ride he operated, in violation of Massachusetts law.

Despite of the top attendant's duty to remain vigilant, plaintiff Melissa Catapano was permitted by the top operator to descend the ride on *four* occasions with her shoulder harness defeated, and placed improperly behind her back, in clear violation of ride operation rules. *See* **Exhibit J** at p. 158. A screenshot from surveillance video of the accident run (*see* **Exhibit N** at p.15) shows that plaintiff Melissa Catapano rode by the top operator with her shoulder harness displaced. As is clearly visible in this screen shot, the top operator was not even looking at the Plaintiffs. *See* Fisher report, attached as **Exhibit N**, at p. 15. Alex Belanger also testified that he did not see anyone riding without the shoulder harness on the date of the accident. **Exhibit K** at p. 45.

In the most distressing admission of his dereliction of duty, Alex Belanger admitted that he was engaged in other activities while he was serving as the top attendant. He admitted that he was allowed to bring a radio and drawing notepad with him while serving as Top Station attendant, and on that particular day he specifically recalled both having his radio playing and sketching in his notepad. *See* Exhibit K at pp. 111, 174, 205.

Mr. Belanger recognized that he was the "last line of defense" to ensure the riders are wearing their seat belts properly (**Exhibit K** at p.55). He recognized that he was responsible for prohibiting a rider from proceeding down the track without a properly worn shoulder harness. *See* **Exhibit K** at p. 153. Given the location of the Top Attendant and the relatively slow speed of the sled during that portion of the ride, the Top Attendant had the ability to flag down riders for the purpose of enforcing Mountain Coaster policies. *See* **Exhibit K** at p.39; **Exhibit L** at p 23; **Exhibit F** at p. 34.

In addition to Mr. Belanger's failure to enforce ride safety rules, ride operator Vanessa DeZess also failed to observe Melissa Catapano's repeated violations of the rule

pertaining to seat belt use. There are four (4) surveillance cameras placed along the track, with monitors in the bottom station displaying the surveillance feed. *See* **Exhibit D** at p. 19 and **Exhibit F** at p.31. As the ride operator, Ms. DeZess had access to these surveillance monitors at her station, and would have been able to observe Melissa Catapano during her multiple runs down the ride, during which she repeatedly defeated the shoulder harness. Ms. DeZess failed to observe Melissa Catapano riding without her shoulder harness on twelve (12) occasions (four (4) cameras and three (3) previous runs by Melissa Catapano), and failed to ban her from riding again due to violation of the safety rules.

The testimony  of all Jiminy Peak employees, and in fact the admissions of Belanger himself leave no doubt that Jiminy Peak carelessly and recklessly failed to ensure that their operators and ride attendants gave their full attention to the ride they operated in violation of 520 CMR 5.04 6(e). *See* **Exhibit O** at p. 9. Mr. Belanger's failure to fulfill is responsibilities under Massachusetts law and insure that Melissa Catapano properly used her seat belt and complied with ride safety rules resulted in plaintiffs' extensive injuries. *See*, Fisher report attached hereto as **Exhibit N**; *see also* Van Arsdell report attached as **Exhibit P**.

ii.      520 CMR 5.08 (5)(a)

Furthermore, MA 520 CMR 5.08 (5)(a) addresses control of operation by the ride operator. Specifically, section 520 CMR 5.08 (5)(a)7 mandates that "The ride operator shall exercise control over the ride to prevent dangerous actions by a rider." Beyond Jiminy Peak's failures described above, Jiminy Peak also failed to stop Melissa Catapano from following other riders too closely. On one ride prior to the accident run, Melissa

Catapano was observed controlling the coaster bob too closely ("tailgating") behind another sled—well within the 80 ft. distance requirement. *See* Exhibit 11 attached to **Exhibit M**. Such conduct is indicative of a rider who ignores posted safety rules, and presents a danger to herself and other patrons.  When identified, these scofflaws require immediate and decisive action.  Jiminy Peak once again did nothing.

Jiminy Peak workers unanimously testified that it was within their power to eject radicals from the park.  Yet, Jiminy Peak did nothing, thereby allowing this action to occur.   Melissa Catapano was not instructed to confirm to the rules, and was not banned from riding again. *See* **Exhibit K** at 45 . Had Jiminy Peak employees properly adhered to their obligations pursuant to 520 CMR 5.08 (5)(a)7, Melissa Catapano would have been banned from the ride for violating the well posted safety rules, and the subject accident would, without question have been prevented. *See* **Exhibit O** at p 9.

    iii.        520 CMR 5.03 (2)

Section 520 CMR 5.03 (2) generally governs rider responsibility. 520 CMR 5.03 (2)(a), (2)(b) and (2)(d), states:

> (2) Rider Responsibility Requirements.
> There are inherent risks in the participation in or on any amusement device. Riders accept the risks inherent in such participation of which the ordinary prudent person is or should be aware.
> (a) Riders shall exercise good judgment and act in a responsible manner while using any amusement device. Riders shall obey all oral warnings by the ride operator, certified maintenance mechanic, or any inspector.
> (b) Riders shall obey all instructional and warning signs clearly posted on the amusement device.
> . . .
> (d) Riders shall use all amusement ride safety devices provided on a ride to ensure their safety. **No person shall bypass, remove or make any safety device inoperable**.      (emphasis added)

The Massachusetts Department of Public Safety concluded that both acts of riding without her seat belt properly worn on her body and tailgating "…are in direct violation of the rider safety rules for the device and should be considered safety risks for the rider."
*See* **Exhibit M**, p. 8.

As a result of their investigation, the Inspector opined the following:

> [Melissa] rode the Mountain Coaster three times on August 12, 2012 and each time she was noted as not wearing her safety restraint properly. She also came too close behind someone (much closer than 80 feet), another violation of the rules. No one stopped her from riding the device improperly... I believe this incident occurred as a direct result of the operator of sled #28, [Melissa], not operating the sled according to the clearly displayed rules for the device. She did not exercise good judgment, she did not obey posted safety warning signs and she did not utilize her shoulder restraint properly.

*See* **Exhibit M**, p. 10.

The report concludes that Jiminy Peak did not have the methods in place to ensure full compliance with Massachusetts Amusement Regulations, 520 CMR 5.03 (2)(a), (2)(b) and (2)(d). *Id.* The Department of Public Safety acknowledged that Jiminy Peak had posted notices and signage in accordance with the manufacturer's recommendations warning riders of their obligation to exercise good judgment and act responsibly, but, according to the investigator, Jiminy Peak "…did not establish methods for ensuring full compliance with these safety regulations at the time of the incident and have only reviewed, updated and clarified compliance methods as a result of recent incidents." *Id.;see also* **Exhibit O** at p.7.

The Report also states as a matter of concern that if someone is found to be violating the park's rule by not operating the sled in full compliance with the safety rules,

the only consequence is that the violator can be prohibited from riding the attraction again. *See* **Exhibit M**, p. 10. Tragically, Jiminy Peak did not even utilize this power.

There is not doubt that Jiminy Peak did not take all necessary preventative measures in order to ensure rider safety, in accordance with their contractual obligation, thereby triggering their defense and indemnity obligations to Wiegand.

      B.     <u>Jiminy Peak's Defective Operation of the Ride in Violation of Ride Safety Rules</u>

Wiegand provided its operating and maintenance manual to Jiminy Peak. **Exhibit B**. Jiminy Peak also maintained its own operating manual as to the subject ride. *See* **Exhibit D**. In addition, Wiegand's ride safety sign and warnings (*see* **Exhibit G**), which was to be displayed to the riders, and to be enforced by Jiminy Peak, was placed at the entrance of the ride. Of note, the sign required all riders to follow staff members' instructions and required staff members to refuse access to riders who do not follow the sign's safety instructions, which included the proper use of the safety belts. *See* **Exhibit G**. In violation of its obligations, Jiminy Peak allowed  Melissa Catapano to continue to use the ride even though she admitted that she repeatedly violated the safety belt use requirement.   *See* Exhibit J at pp. 36, 52, 158.

Jiminy Peak employees did not comply with the prescribed safety rules. *See* **Exhibit O** at p. 12. The ride attendants and operator all stated in their depositions that if they witnessed a rider violating a rule more than once, they were to prohibit the rider from riding again. *See* **Exhibit L** at pp.20-21; **Exhibit K** at p. 148; **Exhibit F** at p.38. However, this is in contrast to the posted Wiegand's "Conditions of Use" sign (**Exhibit G**) located at the Bottom Station stating: "You must follow the instructions of the staff. Anyone  not  observing  these  conditions  will  be  excluded  from  the  installation

immediately." Regardless of whether their duty was triggered by one or more than one rule violation, and given the unquestionable importance of wearing seat belts for rider safety, as specified in the posted operation instructions the fact remains that Jiminy Peak *did nothing*.

Both Wiegand and Jiminy Peak had clear policies regarding seat belt usage on the Mountain Coaster. The Wiegand Operator Manual states that personnel must inform riders that they "keep the safety belt closed during the complete ride." The Wiegand Operator Manual also dictates the following:

> The personnel must supervise the putting on of the safety belts with utmost care. To fasten the seat belts is absolutely obligatory!!! For the customer sitting in front the pelvis safety belt must be fastened so that pelvic bones are embraced. The movement upwards in the abdomen area must be excluded (Attention when thick clothed!). For the passenger sitting behind the three point safety belt must be fastened as in a motor car.

"Wiegand Alpine-Coaster Operating and Maintenance Instructions," dated 4/18/2005, *see* **Exhibit B** at pp. 16-17.

In addition, with regards to Jiminy Peak's policies, the Mountain Adventure Park Manual mandates that the operator "physically check seat belts for each and every rider(s)" and specifies that "seat belts must be worn at all times." See **Exhibit D** at pp. 19020. Jiminy Peak was fully aware, at least since the summer before the alleged accident, that some riders were defeating the shoulder harness during their use of the ride, and in fact, trained the ride operators to watch out for the riders that do not properly employ the shoulder harness. *See* **Exhibit K** at pp. 42-43;146-147 and **Exhibit F** at p. 34. Despite the fact that ride attendants were to ensure seat belts were worn properly, and that it was a known safety concern by the operator, ride attendant and park manager at Jiminy Peak that riders would purposely defeat their shoulder restraint while on the

Mountain Coaster ride, Jiminy Peak again did nothing. Although there was knowledge of riders defeating the safety restraint, Jiminy Peak never identified this hazardous practice to Wiegand or the State Inspectors. *See* **Exhibit O** at p. 11-12.  Therefore, Jiminy Peak chose to maintain full dominion and control over insuring that riders properly used their seat belts, but failed in the performance of their duty.

Although Jiminy Peak had rules regarding seat belt usage, age restrictions, and tailgating; they did not enforce these rules.   Melissa Catapano admitted that she defeated the shoulder harness on *four* separate occasion in less than a two day span, rode the sled with a passenger at least three times even though she was younger than 16, and was observed tailgating on at least one occasion. In spite of these numerous violations, **Jiminy Peak did nothing**.  Had Jiminy Peak Employees properly performed its duties and enforced adherence to the posted rules, the subject accident would have been prevented. *See* **Exhibit O** at p. 12.

> C.   Jiminy Peak's Own Actions, and Violations of the Applicable Laws, Triggered the Indemnity Provisions as Contemplated by Section 12 A. (2).

As outlined in the foregoing, there is no question that Jiminy Peak failed to operate the ride in the manner prescribed by the Contract, and failed to comply with applicable safety laws. Section 8(i) of the Contract, mandates that the ride must be operated strictly in accordance with the design specifications and written maintenance and instructions provided by Wiegand.   Jiminy Peak had the obligation to take all necessary preventative measures in order to ensure rider safety. Failing this charge, and in violating the above referenced safety laws, Jiminy Peak triggered the indemnity provisions as contemplated by section 12 A. (2).  Jiminy Peak must indemnify Wiegand pursuant to the contract.

**III. Jiminy Peak is not Entitled to Common Law Indemnification from Wiegand as It is not Blameless and There is no Evidence that any Wrongful Conduct by Wiegand Caused the Plaintiff's Injuries.**

Under Massachusetts common law, "[i]ndemnity . . . allows someone who is without fault, compelled by operation of law to defend himself against the wrongful act of another, to recover from the wrongdoer the entire amount of his loss, including reasonable attorney's fees." *Elias v. Unisys Corp.*, 410 Mass. 479, 482, 573 N.E.2d 946 (1991). "[I]f a manufacturer supplies a defective product to a retailer, who sells it to a customer, who recovers from the retailer for an injury incurred, the retailer may recover in indemnity against the manufacturer." *Fireside Motors, Inc. v. Nissan Motor Corp.*, 395 Mass. 366, 370, 479 N.E.2d 1386 (1985), quoting Restatement (Second) of Torts § 886B comment c (1979).

However, the right to common law indemnity is limited to those cases where the person seeking indemnification is blameless, but is held derivatively or vicariously liable for the wrongful act of another. *See*, e.g., *Fireside Motors, Inc.*, *supra* at 369-370; *Decker v. Black & Decker Mfg. Co.*, 389 Mass. 35, 40, 449 N.E.2d 641 (1983). "The general rule is that a person who negligently causes injury to a third person is not entitled to indemnification from another person who also negligently caused that injury." *Fireside Motors, Inc.*, *supra* at 370, quoting *Rathbun v. Western Mass. Elec. Co.*, 395 Mass. 361, 364, 479 N.E.2d 1383 (1985). Here, as already detailed in Section II, in the testimony of the Jiminy Peak employees themselves, and in the expert reports of Jacob Fisher and Eugenia Kennedy (*see* **Exhibits N** and **O**), Jiminy Peak negligently causes injury to a third person , and is not entitled to indemnification under the common law.

Furthermore, and more importantly, in this case, no evidence has been proffered

to even suggest that Wiegand is in any way liable to the plaintiffs for the claims and causes of actions arising under product liability theories. Specifically, neither plaintiffs nor Jiminy Peak have disclosed expert reports to substantiate any claim that the ride is defective. Without expert testimony, a claim that a product is defective must fail. *See* citations below. In fact, Jiminy Peak in its discovery responses never even alleges that the slide is defective. Accordingly, Wiegand owes no common law indemnity to Jiminy Peak.

Under Massachusetts law, expert testimony must be presented in product liability actions when "the nature of the defect or breach of warranty" is complex. *Laspesa v. Arrow Int'l, Inc.*, 2009 U.S. Dist. LEXIS 121576 at *12 (D. Mass. Dec. 23, 2009), citing *Hochen v. Bobst Group, Inc.*, 290 F.3d 446, 451 (1st Cir. 2002). Courts applying Massachusetts law have ruled that the complexities in understanding a product's design characteristics, safe optimal use, and possible design alternatives require the assistance of an expert opinion and are beyond the scope of a normal person's knowledge. *Esturban v. Mass Bay Transp. Auth.*, 68 Mass. App. Ct. 911, 911, 865 N.E.2d 834 (Mass. App. Ct. 2007); *Goffredo v. Mercedes-Benz Truck Co.*, 402 Mass. 97, 104, 520 N.E.2d 1315 (1988); *Wiska v. St. Stanislaus Social Club, Inc.*, 7 Mass. App. Ct. 813, 821, 390 N.E.2d 1133 (Mass. App. Ct. 1979). Likewise, in order to avoid speculation regarding the appropriateness and adequacy of warnings given, a court will require the plaintiff to proffer an expert opinion. *Laspesa v. Arrow Int'l, Inc.*, *supra*, at*19-*20.

In the subject action, any allegations, unsupported by any expert opinion, regarding the defects in the ride's design, including the adequacy of the safety features, possible alternative designs, and safe use conditions of the ride clearly fall beyond the

scope of a normal person's knowledge. Likewise, the analysis of the sufficiency of the ample warnings given by Wiegand also fall beyond the scope of a normal person's knowledge. As such, any party wishing to prove these allegations against Wiegand will be required to present expert opinions to prove the allegations.

Now, at the close of discovery, neither plaintiffs nor Jiminy Peak have proffered any expert opinions to support any of the product liability claims against Wiegand. As such, no party will be able to prove that any alleged defect in the ride caused the plaintiffs' injuries and the subsequent losses sustained by Jiminy Peak and Wiegand. Without proof of Wiegand's wrongful act (resulting in alleged losses sustained by Jiminy Peak), Wiegand does not owe common law indemnity to Jiminy Peak. Rather, as supported by expert opinions proffered by Wiegand, Jiminy Peak undoubtedly owes common law indemnity to Wiegand.

## **CONCLUSION**

In light of all the foregoing, there exists no genuine issue of material fact. The facts, testimony and evidence developed to date all support the conclusion that Defendant WIEGAND SPORTS, LLC is entitled to indemnification from Jiminy Peak. As such, defendant WIEGAND SPORTS, LLC is entitled to judgment as a matter of law on its cross-claims and it would be proper for this Honorable Court to grant the defendant's Motion for Summary Judgment.

Dated: White Plains, New York
     October 14, 2015

                           Respectfully submitted,

                           GOLDBERG SEGALLA, LLP

                           /s/ Frank J. Ciano

By: Frank J. Ciano
Admitted *pro hac vice*
**Attorneys for Defendant**
**Wiegand Sports, LLC**
11 Martine Avenue, Suite 750
White Plains, NY 10601-1717
Telephone: (914) 798-5400
Email: fciano@goldbergsegalla.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via electronic filing with the Clerk of the Court using CM/ECF on this 14th day of October, 2015, on all counsel or parties of record as identified on the Notice of Electronic Filing (NEF).

/s/ Frank J. Ciano
By: Frank J. Ciano