**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**(WESTERN DIVISION)**

| | |
|---|---|
| MELISSA CATAPANO, an infant by her father and natural guardian, John Catapano, and JOHN CATAPANO, Individually and DANIELLE CATAPANO, an infant by her mother and natural guardian, CHRISTINE CATAPANO and CHRISTINE CATAPANO, individually,<br><br>Plaintiffs,<br><br>vs.<br><br>JIMINY PEAK MOUNTAIN RESORT, LLC and WIEGAND SPORTS, LLC,<br><br>Defendant. | C.A. NO.: 3:13-cv-30119-MAP<br><br>{Consolidated with Lead Case:<br>C.A. No. 3:13-CV-30108-KPN} |

**DEFENDANT WIEGAND SPORT, LLC'S OPPOSITION OF DEFENDANT JIMINY PEAK MOUNTAIN RESORT, LLC MOTION FOR SUMMARY JUDGMENT**

Defendant, WIEGAND SPORTS, LLC (hereinafter "Wiegand"), by and through undersigned counsel, hereby submits its Opposition to defendant JIMINY PEAK MOUNTAIN RESORT, LLC's (hereinafter "Jiminy Peak") Motion for Summary Judgment [DE62], and states the following in support:

**INTRODUCTION**

Jiminy Peak seeks summary judgment based solely on the argument that, pursuant to the terms of section 12 A (1) of the Consulting, Purchase, Delivery, Assembly, and Inspection Contract (hereinafter, the "Contract") between Jiminy Peak and Wiegand, Wiegand must defend and indemnify Jiminy Peak in the event of losses incurred as a

result of a product liability lawsuit. Jimmy Peak argues that Wiegand breached its contractual duty by not providing defense and indemnity pursuant to the terms of section 12 A (1). However, Jiminy Peak's arguments are without merit as they focus on the isolated reading of only section 12 A (1), ignoring the rest of the Contract. Instead of taking the Contract between Jiminy Peak and Wiegand as a whole, and determining the intent of the parties therefrom, Jiminy Peak seeks to focus only on one clause that should not be read in a vacuum.

As further outlined in detail herein, the intent of the parties is clear from the terms contained in the Contract. The parties did not intend for Wiegand to have to defend and indemnify Jiminy Peak regardless of the circumstances from which the lawsuit may have arose. In this case, as reflected in the other clauses in the Contract conveniently ignored by Jiminy Peak, Jiminy Peak is not entitled to contractual or common law indemnification or contribution from Wiegand. In fact, it is Jiminy Peak that owes Wiegand indemnification due to its defective operation of the ride and its violations of the applicable Massachusetts laws governing amusement ride safety, which caused or contributed to the injuries to the plaintiffs. The contract between Jiminy Peak and Wiegand clearly intended for Jiminy to be responsible for safe operation of the ride and to take all necessary steps to ensure rider safety, and for Jiminy Peak to indemnify Wiegand for losses arising from Jiminy Peak's failure to do so. Looking at the Contract ad a whole, Wiegand did not breach its contractual obligation by declining to defend and indemnify Jiminy Peak under these circumstances.

Evidence developed up until the close of discovery in this case is insufficient to support Jiminy Peak's cross-claims, and this Honorable Court should properly deny Jiminy Peak's Motion for Summary Judgment.

## ARGUMENTS IN OPPOSITION

### I. THE INTENTION OF THE PARTIES ON THE ISSUE OF INDEMNIFICATION WERE NOT SOLELY CONTAINED IN SECTION 12 A (1) OF THE CONTRACT

Contractual agreements to indemnify are enforceable and are subject to the same rules of construction applicable to contracts generally. *Laiho v. CONRAIL*, 4 F. Supp. 2d 45 (D. Mass. 1998). "Massachusetts courts employ the general rules of contract interpretation to construe indemnification provisions. As with any contract, a written indemnification agreement is to be interpreted in light of its language, background and purpose." *Id.* at 50.

Under current Massachusetts law, contracts of indemnity are to be fairly and reasonably construed in order to ascertain the intention of the parties and to effectuate the purpose sought to be accomplished. *Post v. Belmont Country Club*, 805 N.E.2d 63,69 (Mass. App. Ct. 2004); *Shea v. Bay State Gas Co.*, 418 N.E.2d 597 (Mass. 1981). "The intent of the parties to a contract must be determined from a fair construction of the contract as a whole." *Williams v. Williams*, 88 Mass. App. Ct. 1109 (Mass. App. Ct. 2015).

It is long established that the intent of the parties should be determined from the entire contract rather than a single clause. *Haverhill v. George Brox, Inc.*, 47 Mass. App. Ct. 717, 720, 716 N.E.2d 138 (1999) (intent of parties is to be discerned from words in

question, **entire instrument**, and circumstances surrounding agreement). Courts look to the plain meaning of the language chosen, and consider the "contract as a whole, in a reasonable and practical way." *NStar Elec. Co. v. Department of Pub. Utils.*, 462 Mass. 381, 394, 968 N.E.2d 895 (2012), quoting *MCI WorldCom Communs., Inc. v. Dep't of Telcoms. & Energy,* 442 Mass. 103, 113, 810 N.E.2d 802 (2004).

In this case, the intent of the parties is clear from the plain reading of the Contract. The parties do not intend for Wiegand to indemnify Jiminy Peak regardless of Jiminy Peak's own fault or role in causing the injuries which result in the lawsuit. Jiminy Peak relies completely, in a vacuum, on section 12 A. (1) of the Contract which provides that "in the event of a product liability suit against [Wiegand], [Wiegand] shall, at its own expense, defend any suit or proceeding brought against [Jiminy Peak] and shall fully protect and indemnify [Jiminy Peak] against any and all losses, liability, cost, recovery, or other expense in or resulting from such breach, default or suit", (*see* **Exhibit A** at p. 6). However, this is not the only circumstance under which indemnification is triggered. The parties also considered the circumstance in which, as was the case in the action *sub judice*, the underlying *cause* of the lawsuit stemmed from the actions and inactions of Jiminy Peak.

As an initial matter it must be noted that in the subject action, plaintiffs made no product liability claims against Jiminy Peak. Plaintiff's product liability claims (which were not substantiated by any expert reports) were made against Wiegand. Plaintiffs' claims against Jiminy Peak are grounded in Jiminy Peak's negligent and unsafe operation of the ride. Since Jiminy Peak's malfeasance was the cause of the subject incident, Jiminy

Peak is obliged to defend and indemnifyWiegand, as mandated by the sensible and unambiguous terms of the contract, and which reflects the true intentions of the parties.

The Contract also provides for indemnification of Wiegand by Jiminy Peak, given circumstances where Jiminy Peak's own actions and inactions caused the loss sustained by the parties. Specifically, section 12 A. (2) states:

> (2) [Jiminy Peak] agrees to protect, indemnify, defend and hold [Wiegand] harmless from and against any and all losses of [Wiegand] arising out of or sustained, in each case, directly or indirectly, from **any breach of representation, covenant of [Jiminy Peak] made herein or any default by [Jiminy Peak] hereunder,** including without limitation, **from defective/bad maintenance and/or operation of the Alpine Coaster caused by [Jiminy Peak]'s gross negligence or willful misconduct, (except to the extent such maintenance and/or operation was in conformity with [Wiegand]'s operation and maintenance specifications or recommendations), or non-compliance with applicable law**. [Jiminy Peak] shall not be liable for any consequential, special, incidental, exemplary, or punitive damages or any claim for lost business or lost business opportunities.

Exhibit A of DE 70 at p. 8 (emphasis added).

Section 12 A. (1) broadly considers that a lawsuit containing product liability allegations may arise against both Wiegand and Jiminy Peak. Section 12 A. (2) better defines the circumstances under which Wiegand must be indemnified by Jiminy Peak from losses incurred in association with such lawsuits. These expressly include breach of covenant by Jiminy Peak, defective operation of the ride and non-compliance of applicable laws. 12 A. (2) is not, by any definition, a simple parallel indemnity clause. It is important to note also that one of the covenants mentioned, the breach of which results in the triggering of Jiminy Peak's indemnity obligations, includes <u>the obligation for Jiminy Peak to safely and properly operate the ride and to take all necessary measures to ensure rider safety</u>. Specifically, section 8(i) of the Contract provides:

> **Operation of Alpine Coaster. [Jiminy Peak] shall ensure that only trained personnel will operate the Alpine Coaster in accordance with the design specifications and written maintenance and instructions provided by [Wiegand]**, to the extent such instructions do not conflict with applicable regulatory or insurance authorities' instructions. [Jiminy Peak] will make certain that each customer riding the Alpine Coaster signs a standard waiver form disclaiming liability for any injuries sustained **and shall take all necessary preventative measures in order to ensure rider safety**. [Jiminy Peak] shall provide a copy of the waiver to the [Wiegand] prior to the Handing Over Date.

**Exhibit A** of DE 70 at p. 6 (emphasis added).

Section 8(i) highlights the recognition of the parties that Jiminy Peak, as the operator of the ride, is in the best position to, and in fact has the obligation to, ensure the safety of the riders, and to properly operate the ride in the manner that is in conformity with applicable laws and Wiegand's safety instructions. It is further proof that section 12 A. (1) should not be considered in a vacuum, and that the parties intended that indemnity should be properly extended to Wiegand in the event that losses are sustained due to Jiminy Peak's culpable conduct or non-compliance with applicable law pertaining to rider safety.

Furthermore, it is clearly the intent of the parties that any liability for personal injury arising from the use of the ride must be defended by Jiminy Peak. Addendum B of the Contract states:

> Liability
> Any additional liability for damages beyond that provided for in the above-stated terms is excluded, irrespective of the nature of the legal claim. **This applies in particular to personal injuries that may occur during the use of Seller's sports and leisure installations. The Buyer agrees to defend against such claims by obtaining adequate liability insurance.**

Exhibit A of DE 70 at p 13. (emphasis added).

The inclusion of this paragraph in Addendum B of the Contract, when read in conjunction with Jiminy Peak's obligations under section 8(i) to ensure ride safety,

further demonstrates that the parties intended for Jiminy Peak to defend against personal injury liability arising from injuries sustained by patrons during the use of the ride, and to indemnify Wiegand, in the event that Jiminy Peak's actions lead to a lawsuit against both parties. It is clear from this paragraph that it is not the intent of the parties for Wiegand to defend and indemnify Jiminy Peak under all circumstance where they are involved in a liability suit arising from the use of the ride.

There is no doubt that, in the event of a lawsuit, 12 A. (1) should not be considered in a vacuum, without considering the role of Jiminy Peak. Contractual indemnity language is only ambiguous where "an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and obligations undertaken." *Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076, 1083 (1st Cir. 1989). Here, considering the plain language of section 12 A as a whole, and in conjunction with Jiminy Peak's obligations under Section 8(i), and Jiminy Peak's sole fault in *causing* the accident, there is no ambiguity as to the parties' intention to require Jiminy Peak to indemnify Wiegand, in the event that Jiminy Peak's actions lead to a lawsuit against both parties.

As further detailed below and in the expert reports of Jacob Fisher and Eugenia Kennedy (*see* **Exhibits N** and **O** of DE 70), there is uncontested evidence[1] that Jiminy Peak's own actions, and violations of the applicable laws, triggered the indemnity provisions as contemplated by section 12 A. (2). Under these circumstances, it is clear that Wiegand did not have the duty to defend and indemnify Jiminy Peak, and as such,

[1] Jiminy Peak never retained any exerts to refute the opinions of Kennedy and Fisher. In fact, their opinions were so sound that Jiminy Peak did not bother to challenge their opinions under cross examination in deposition.

Wiegand did not breach any of its obligations pursuant to the terms of the Contract and Jiminy Peak's Motion for Summary Judgment should be denied.

## II. It is Wiegand that is Entitled to Contractual Indemnification Due to Jiminy Peak's Violation of the Applicable Statutes Governing Amusement Ride Safety and Due to Jiminy Peak's Defective Operation of the Ride.

After extensive discovery and investigation, the written discovery and deposition testimonies making up the undisputed facts in this matter confirm that Jiminy Peak's own actions, defective operation of the subject ride, and violations of the applicable law caused or contributed to the plaintiffs' accident, and led to the losses sustained by both Wiegand and Jiminy. *See*, generally, expert report of Eugenia Kennedy attached here as **Exhibit O** of DE 70. Therefore, there is no question that Jiminy Peak is obliged to defend and indemnify Wiegand.

A. <u>Jiminy Peak's Non-Compliance with Applicable Law.</u>

As outlined in Ms. Kennedy's unchallenged report, Jiminy Peak violated several Massachusetts laws governing the operation of Amusement Rides. These include Massachusetts Amusement Regulations 520 CMR 5.04 6(e), 520 CMR 5.08 (5)(a)7. *See* **Exhibit O** of DE 70, at pp. 8-9. Jiminy Peak also failed to ensure full compliance with 520 CMR 5.03. *See* **Exhibit O** of DE 70, at pp.6-7. *See also*, Holmes report, **Exhibit M** of DE 70, at p. 10.

i. 520 CMR 5.04 6(e)

The Massachusetts Amusement Regulations found in MA 520 CMR 5.04 define the responsibilities of an owner of an amusement ride, such as Jiminy Peak, in training ride operators. Section MA 520 CMR 5.04 (6)(e), states the following:

> (e) The owner shall instruct all operators to give their full attention to any ride they operate.

Contrary to this requirement, evidence in this case clearly establishes that Jiminy Peak employees, who were responsible for ensuring rider safety, failed to give their full attention to the ride as required by the law.

In particular, on the date of the accident, Jiminy Peak employee Alex Belanger was working in the critical position as the Top Station attendant. *See* **Exhibit K** of DE70 at p. 45. The top station attendant is the last "line of defense" to insure safe rider operation. His job is to supervise the riders as they reach the top of the mountain, and before they descend down the track to insure that they are fully compliant with all rules for the operation of the slide. *See* **Exhibit K** of DE 70 at p. 55. The Top Station attendant also has access to a button control that could be used to stop the lift in the event of an unsafe condition and make sure no one could proceed down the course. *See* **Exhibit K** of DE 70 at p. 39. According to the testimony of all Jiminy Peak employees deposed, the top operator is supposed to monitor the rider's compliance with the safety rules, including the proper use of the seat belts. *See* **Exhibit F** of DE 70 at p. 26-27; **Exhibit K** of DE 70 at pp. 35-36, 130-131. The Jiminy Peak witnesses also testified that any rider caught disobeying the safety rules is supposed to be banned from riding. *See* **Exhibit F** of DE 70 at p. 38; **Exhibit K** of DE 70 at pp. 148; **Exhibit L** of DE 70 at pp. 20-21. Jiminy Peak employee Belanger failed to give his full attention to any ride he operated, in violation of Massachusetts law.

Despite the top attendant's duty to remain vigilant, plaintiff Melissa Catapano was permitted by the top operator to descend the ride on ***four*** occasions with her shoulder harness defeated, and placed improperly behind her back, in clear violation of ride

operation rules. *See* **Exhibit J** of DE70 at p. 158. A screenshot from surveillance video of the accident run (*see* **Exhibit N** of DE 70 at p.15) shows that plaintiff Melissa Catapano rode by the top operator with her shoulder harness displaced. As is clearly visible in this screen shot, the top operator was not even looking at the Plaintiffs. *See* Fisher report, attached as **Exhibit N** of DE 70, at p. 15. Alex Belanger also testified that he did not see anyone riding without the shoulder harness on the date of the accident. **Exhibit K** of DE 70 at p. 45.

In the most distressing admission of his dereliction of duty, Alex Belanger admitted that he was engaged in other activities while he was serving as the top attendant. He admitted that he was allowed to bring a radio and drawing notepad with him while serving as Top Station attendant, and on that particular day he specifically recalled both having his radio playing and sketching in his notepad. *See* **Exhibit K** of DE 70 at pp. 111, 174, 205.

Mr. Belanger recognized that he was the "last line of defense" to ensure the riders are wearing their seat belts properly (**Exhibit K** of DE 70 at p.55). He recognized that he was responsible for prohibiting a rider from proceeding down the track without a properly worn shoulder harness. *See* **Exhibit K** of DE 70 at p. 153. Given the location of the Top Attendant and the relatively slow speed of the sled during that portion of the ride, the Top Attendant had the ability to flag down riders for the purpose of enforcing Mountain Coaster policies. *See* **Exhibit K** of DE 70 at p.39; **Exhibit L** of DE 70 at p 23; **Exhibit F** of DE 70 at p. 34.

In addition to Mr. Belanger's failure to enforce ride safety rules, ride operator Vanessa DeZess also failed to observe Melissa Catapano's repeated violations of the rule

pertaining to seat belt use. There are four (4) surveillance cameras placed along the track, with monitors in the bottom station displaying the surveillance feed. *See* **Exhibit D** of DE 70 at p. 19 and **Exhibit F** of DE 70 at p.31. As the ride operator, Ms. DeZess had access to these surveillance monitors at her station, and would have been able to observe Melissa Catapano during her multiple runs down the ride, during which she repeatedly defeated the shoulder harness. Ms. DeZess failed to observe Melissa Catapano riding without her shoulder harness on twelve (12) occasions (four (4) cameras and three (3) previous runs by Melissa Catapano), and failed to ban her from riding again due to violation of the safety rules.

The testimony of all Jiminy Peak employees, and in fact the admissions of Belanger himself leave no doubt that Jiminy Peak carelessly and recklessly failed to ensure that their operators and ride attendants gave their full attention to the ride they operated in violation of 520 CMR 5.04 6(e). *See* **Exhibit O** of DE 70 at p. 9. Mr. Belanger's failure to fulfill his responsibilities under Massachusetts law and insure that Melissa Catapano properly used her seat belt and complied with ride safety rules resulted in plaintiffs' extensive injuries. *See*, Fisher report attached hereto as **Exhibit N** of DE 70; *see also* Van Arsdell report attached as **Exhibit P** of DE 70.

ii. 520 CMR 5.08 (5)(a)

Furthermore, MA 520 CMR 5.08 (5)(a) addresses control of operation by the ride operator. Specifically, section 520 CMR 5.08 (5)(a)7 mandates that "The ride operator shall exercise control over the ride to prevent dangerous actions by a rider." Beyond Jiminy Peak's failures described above, Jiminy Peak also failed to stop Melissa Catapano from following other riders too closely. On one ride prior to the accident run, Melissa

Catapano was observed controlling the coaster bob too closely ("tailgating") behind another sled—well within the 80 ft. distance requirement. *See* Exhibit 11 attached to **Exhibit M** of DE 70. Such conduct is indicative of a rider who ignores posted safety rules, and presents a danger to herself and other patrons. When identified, these scofflaws require immediate and decisive action. Jiminy Peak once again did nothing.

Jiminy Peak workers unanimously testified that it was within their power to eject radicals from the park. Yet, Jiminy Peak did nothing, thereby allowing this action to occur. Melissa Catapano was not instructed to conform to the rules, and was not banned from riding again. *See* **Exhibit K** of DE 70 at 45 . Had Jiminy Peak employees properly adhered to their obligations pursuant to520 CMR 5.08 (5)(a)7, Melissa Catapano would have been banned from the ride for violating the well posted safety rules, and the subject accident would, without question have been prevented. *See* **Exhibit O** of DE 70at p 9.

iii. 520 CMR 5.03 (2)

Section 520 CMR 5.03 (2) generally governs rider responsibility. 520 CMR 5.03 (2)(a), (2)(b) and (2)(d), states:

> (2) Rider Responsibility Requirements.
> There are inherent risks in the participation in or on any amusement device. Riders accept the risks inherent in such participation of which the ordinary prudent person is or should be aware.
> (a) Riders shall exercise good judgment and act in a responsible manner while using any amusement device. Riders shall obey all oral warnings by the ride operator, certified maintenance mechanic, or any inspector.
> (b) Riders shall obey all instructional and warning signs clearly posted on the amusement device.
> . . .
> (d) Riders shall use all amusement ride safety devices provided on a ride to ensure their safety. **No person shall bypass, remove or make any safety device inoperable**. (emphasis added)

The Massachusetts Department of Public Safety concluded that both acts of riding without her seat belt properly worn on her body and tailgating "…are in direct violation of the rider safety rules for the device and should be considered safety risks for the rider." *See* **Exhibit M** of DE 70, p. 8.

As a result of their investigation, the Inspector opined the following:

> [Melissa] rode the Mountain Coaster three times on August 12, 2012 and each time she was noted as not wearing her safety restraint properly. She also came too close behind someone (much closer than 80 feet), another violation of the rules. No one stopped her from riding the device improperly... I believe this incident occurred as a direct result of the operator of sled #28, [Melissa], not operating the sled according to the clearly displayed rules for the device. She did not exercise good judgment, she did not obey posted safety warning signs and she did not utilize her shoulder restraint properly.

*See* **Exhibit M** of DE 70, p. 10.

The report concludes that Jiminy Peak did not have the methods in place to ensure full compliance with Massachusetts Amusement Regulations, 520 CMR 5.03 (2)(a), (2)(b) and (2)(d). *Id.* The Department of Public Safety acknowledged that Jiminy Peak had posted notices and signage in accordance with the manufacturer's recommendations warning riders of their obligation to exercise good judgment and act responsibly, but, according to the investigator, Jiminy Peak "…did not establish methods for ensuring full compliance with these safety regulations at the time of the incident and have only reviewed, updated and clarified compliance methods as a result of recent incidents." *Id.;see also* **Exhibit O** of DE 70 at p.7.

The Report also states as a matter of concern that if someone is found to be violating the park's rule by not operating the sled in full compliance with the safety rules, the only consequence is that the violator can be prohibited from riding the attraction

again. *See* **Exhibit M** of DE 70, p. 10. Tragically, Jiminy Peak did not even utilize this power.

There is not doubt that Jiminy Peak did not take all necessary preventative measures in order to ensure rider safety, in accordance with their contractual obligation, thereby triggering their defense and indemnity obligations to Wiegand.

B. Jiminy Peak's Defective Operation of the Ride in Violation of Ride Safety Rules

Wiegand provided its operating and maintenance manual to Jiminy Peak. **Exhibit B** of DE 70. Jiminy Peak also maintained its own operating manual as to the subject ride. *See* **Exhibit D** of DE 70. In addition, Wiegand's ride safety sign and warnings (*see* **Exhibit G** of DE 70), which was to be displayed to the riders, and to be enforced by Jiminy Peak, was placed at the entrance of the ride. Of note, the sign required all riders to follow staff members' instructions and required staff members to refuse access to riders who do not follow the sign's safety instructions, which included the proper use of the safety belts. *See* **Exhibit G** of DE 70. In violation of its obligations, Jiminy Peak allowed Melissa Catapano to continue to use the ride even though she admitted that she repeatedly violated the safety belt use requirement. *See* **Exhibit J** of DE 70 at pp. 36, 52, 158.

Jiminy Peak employees did not comply with the prescribed safety rules. *See* **Exhibit O** of DE 70 at p. 12. The ride attendants and operator all stated in their depositions that if they witnessed a rider violating a rule more than once, they were to prohibit the rider from riding again. *See* **Exhibit L** of DE 70 at pp.20-21; **Exhibit K** of DE 70 at p. 148; **Exhibit F** of DE 70 at p.38. However, this is in contrast to the posted Wiegand's "Conditions of Use" sign (**Exhibit G** of DE 70) located at the Bottom Station stating: "You must follow the instructions of the staff. Anyone not observing these

conditions will be excluded from the installation immediately." Regardless of whether their duty was triggered by one or more than one rule violation, and given the unquestionable importance of wearing seat belts for rider safety, as specified in the posted operation instructions the fact remains that Jiminy Peak *did nothing*.

Both Wiegand and Jiminy Peak had clear policies regarding seat belt usage on the Mountain Coaster. The Wiegand Operator Manual states that personnel must inform riders that they "keep the safety belt closed during the complete ride." The Wiegand Operator Manual also dictates the following:

> The personnel must supervise the putting on of the safety belts with utmost care. To fasten the seat belts is absolutely obligatory!!! For the customer sitting in front the pelvis safety belt must be fastened so that pelvic bones are embraced. The movement upwards in the abdomen area must be excluded (Attention when thick clothed!). For the passenger sitting behind the three point safety belt must be fastened as in a motor car.

"Wiegand Alpine-Coaster Operating and Maintenance Instructions," dated 4/18/2005, *see* **Exhibit B** of DE 70 at pp. 16-17.

In addition, with regards to Jiminy Peak's policies, the Mountain Adventure Park Manual mandates that the operator "physically check seat belts for each and every rider(s)" and specifies that "seat belts must be worn at all times." *See* **Exhibit D** of DE 70 at pp. 19-20. Jiminy Peak was fully aware, at least since the summer before the alleged accident, that some riders were defeating the shoulder harness during their use of the ride, and in fact, trained the ride operators to watch out for the riders that do not properly employ the shoulder harness. *See* **Exhibit K** of DE 70 at pp. 42-43;146-147 and **Exhibit F** of DE 70 at p. 34. Despite the fact that ride attendants were to ensure seat belts were worn properly, and that it was a known safety concern by the operator, ride attendant and park manager at Jiminy Peak that riders would purposely defeat their shoulder restraint

while on the Mountain Coaster ride, Jiminy Peak again did nothing. Although there was knowledge of riders defeating the safety restraint, Jiminy Peak never identified this hazardous practice to Wiegand or the State Inspectors. *See* **Exhibit O** of DE 70 at p. 11-12. Therefore, Jiminy Peak chose to maintain full dominion and control over insuring that riders properly used their seat belts, but failed in the performance of their duty.

Although Jiminy Peak had rules regarding seat belt usage, age restrictions, and tailgating; they did not enforce these rules. Melissa Catapano admitted that she defeated the shoulder harness on *four* separate occasion in less than a two day span, rode the sled with a passenger at least three times even though she was younger than 16, and was observed tailgating on at least one occasion. In spite of these numerous violations, **Jiminy Peak did nothing**. Had Jiminy Peak Employees properly performed their duties and enforced adherence to the posted rules, the subject accident would have been prevented. *See* **Exhibit O** of DE 70 at p. 12.

C. Jiminy Peak's Own Actions, and Violations of the Applicable Laws, Triggered the Indemnity Provisions as Contemplated by Section 12 A. (2).

As outlined in the foregoing, there is no question that Jiminy Peak failed to operate the ride in the manner prescribed by the Contract, and failed to comply with applicable safety laws. Section 8(i) of the Contract, mandates that the ride must be operated strictly in accordance with the design specifications and written maintenance and instructions provided by Wiegand. Jiminy Peak had the obligation to take all necessary preventative measures in order to ensure rider safety. Failing this charge, and in violating the above referenced safety laws, Jiminy Peak triggered the indemnity provisions as contemplated by section 12 A. (2). Jiminy Peak must indemnify Wiegand pursuant to the contract.

**III. Jiminy Peak is not Entitled to Common Law Indemnification from Wiegand as It is not Blameless and There is no Evidence that any Wrongful Conduct by Wiegand Caused the Plaintiff's Injuries.**

Though it is not specifically discussed in Jiminy Peak's motion, it is also clear from the facts developed throughout discovery of this matter that Wiegand does not owe Jiminy Peak any indemnification under common law either.

Under Massachusetts common law, "[i]ndemnity . . . allows someone who is without fault, compelled by operation of law to defend himself against the wrongful act of another, to recover from the wrongdoer the entire amount of his loss, including reasonable attorney's fees." *Elias v. Unisys Corp.*, 410 Mass. 479, 482, 573 N.E.2d 946 (1991). "[I]f a manufacturer supplies a defective product to a retailer, who sells it to a customer, who recovers from the retailer for an injury incurred, the retailer may recover in indemnity against the manufacturer." *Fireside Motors, Inc. v. Nissan Motor Corp.*, 395 Mass. 366, 370, 479 N.E.2d 1386 (1985), quoting Restatement (Second) of Torts § 886B comment c (1979).

However, the right to common law indemnity is limited to those cases where the person seeking indemnification is blameless, but is held derivatively or vicariously liable for the wrongful act of another. *See*, e.g., *Fireside Motors, Inc.*, *supra* at 369-370; *Decker v. Black & Decker Mfg. Co.*, 389 Mass. 35, 40, 449 N.E.2d 641 (1983). "The general rule is that a person who negligently causes injury to a third person is not entitled to indemnification from another person who also negligently caused that injury." *Fireside Motors, Inc.*, *supra* at 370, quoting *Rathbun v. Western Mass. Elec. Co.*, 395 Mass. 361, 364, 479 N.E.2d 1383 (1985). Here, as already detailed in Section II, in the testimony of the Jiminy Peak employees themselves, and in the expert reports of Jacob Fisher and

Eugenia Kennedy (*see* **Exhibits N** and **O** of DE 70), Jiminy Peak negligently caused injury to a third person , and is not entitled to indemnification under the common law.

Furthermore, and more importantly, in this case, no evidence has been proffered to even suggest that Wiegand is in any way liable to the plaintiffs for the claims and causes of actions arising under product liability theories. Specifically, neither plaintiffs nor Jiminy Peak have disclosed expert reports to substantiate any claim that the ride is defective. Without expert testimony, a claim that a product is defective must fail. *See* citations below. In fact, Jiminy Peak in its discovery responses never even alleges that the slide is defective. Accordingly, Wiegand owes no common law indemnity to Jiminy Peak.

Under Massachusetts law, expert testimony must be presented in product liability actions when "the nature of the defect or breach of warranty" is complex. *Laspesa v. Arrow Int'l, Inc.*, 2009 U.S. Dist. LEXIS 121576 at *12 (D. Mass. Dec. 23, 2009), citing *Hochen v. Bobst Group, Inc.*, 290 F.3d 446, 451 (1st Cir. 2002). Courts applying Massachusetts law have ruled that the complexities in understanding a product's design characteristics, safe optimal use, and possible design alternatives require the assistance of an expert opinion and are beyond the scope of a normal person's knowledge. *Esturban v. Mass Bay Transp. Auth.*, 68 Mass. App. Ct. 911, 911, 865 N.E.2d 834 (Mass. App. Ct. 2007); *Goffredo v. Mercedes-Benz Truck Co.*, 402 Mass. 97, 104, 520 N.E.2d 1315 (1988); *Wiska v. St. Stanislaus Social Club, Inc.*, 7 Mass. App. Ct. 813, 821, 390 N.E.2d 1133 (Mass. App. Ct. 1979). Likewise, in order to avoid speculation regarding the appropriateness and adequacy of warnings given, a court will require the plaintiff to proffer an expert opinion. *Laspesa v. Arrow Int'l, Inc.*, *supra*, at*19-*20.

In the subject action, any allegations, unsupported by any expert opinion, regarding the defects in the ride's design, including the adequacy of the safety features, possible alternative designs, and safe use conditions of the ride clearly fall beyond the scope of a normal person's knowledge. Likewise, the analysis of the sufficiency of the ample warnings given by Wiegand also fall beyond the scope of a normal person's knowledge. As such, any party wishing to prove these allegations against Wiegand will be required to present expert opinions to prove the allegations.

Now, at the close of discovery, neither plaintiffs nor Jiminy Peak have proffered any expert opinions to support any of the product liability claims against Wiegand. As such, no party will be able to prove that any alleged defect in the ride caused the plaintiffs' injuries and the subsequent losses sustained by Jiminy Peak and Wiegand. Without proof of Wiegand's wrongful act (resulting in alleged losses sustained by Jiminy Peak), Wiegand does not owe common law indemnity to Jiminy Peak. Rather, as supported by expert opinions proffered by Wiegand, Jiminy Peak undoubtedly owes common law indemnity to Wiegand.

## CONCLUSION

In light of all the foregoing, there exists no genuine issue of material fact. The facts, testimony and evidence developed to date all support the conclusion that defendant Jiminy Peak is not entitled to defense and indemnification, whether contractual or at common law, from Wiegand. As such, it would be proper for this Honorable Court to deny defendant Jiminy Peak's Motion for Summary Judgment.

Dated: White Plains, New York
October 30, 2015

Respectfully submitted,

GOLDBERG SEGALLA, LLP

/s/ Frank J. Ciano
By: Frank J. Ciano
Admitted *pro hac vice*
***Attorneys for Defendant***
***Wiegand Sports, LLC***
11 Martine Avenue, Suite 750
White Plains, NY 10601-1717
Telephone: (914) 798-5400
Email: fciano@goldbergsegalla.com

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via electronic filing with the Clerk of the Court using CM/ECF on this 30th day of October, 2015, on all counsel or parties of record as identified on the Notice of Electronic Filing (NEF).

/s/ Frank J. Ciano
By: Frank J. Ciano